OPENWAVE SYSTEMS INC. and Bernard Puckett, Plaintiffs,

v.

HARBINGER CAPITAL PARTNERS MASTER FUND I, LTD., Harbinger Capital Partners Special Situations Fund, L.P., James L. Zucco, and Andrew Breen, Defendants.

C.A. No. 2690–VCL.

Court of Chancery of Delaware, New Castle County.

Submitted: March 23, 2007.

Decided: May 18, 2007.

Edward P. Welch, Esquire, Edward B. Micheletti, Esquire, Rachel I. Jacobs, Esquire, Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware; Garrett J. Walzer, Esquire, Skadden, Arps, Slate, Meagher & Flom LLP, Palo Alto, California, Attorneys for the Plaintiffs.

Stephen E. Jenkins, Esquire, Richard D. Heins, Esquire, Richard I.G. Jones, Jr., Esquire, Catherine A. Strickler, Esquire, Andrew D. Cordo, Esquire, Ashby & Geddes, Wilmington, Delaware; M. Douglas Dunn, Esquire, John T. O'Connor, Esquire, Andrew E. Tomback, Esquire, Milbank, Tweed, Hadley & McCloy LLP, New York, New York, Attorneys for the Defendants.

### OPINION

LAMB, Vice Chancellor.

This is a coordinated proceeding involving two related actions brought pursuant

to Section 225 of the Delaware General Corporation Law. In the first filed action, a hedge fund stockholder in a Delaware corporation that attempted to nominate candidates for two board seats at the corporation's January 2007 annual meeting seeks to invalidate the election or, in the alternative, have one of its nominees installed as a validly elected director. The centerpiece of its complaint is the allegation that the provisions of the bylaws relating to nominations of directors are so confusing as to excuse compliance. Relying on those same bylaws, the corporation seeks to declare invalid the nomination of the hedge fund's slate of two directors and to validate the reelection of management's two candidates. Trial was held on March 12, 2007. The parties submitted post-trial briefs on March 23, 2007. For the reasons set forth below, the court finds that the incumbent directors were the only properly nominated candidates and, thus, were rightfully reelected.

## I.

### A. *The Parties*

Openwave Systems, Inc. is a Delaware corporation headquartered in Redwood City, California. Harbinger Capital Partners Master Fund I and Harbinger Capital Partners Special Situations Fund, L.P. (collectively, "Harbinger") are hedge funds that together own approximately 13% of Openwave's common stock. Harbinger invested in Openwave stock because the hedge fund believed the stock was undervalued.

After maintaining only a passive investment in Openwave, Harbinger eventually decided to nominate two candidates, James L. Zucco and Andrew Breen, to the Openwave board to influence the direction of Openwave's operations. Harbinger delivered to Openwave the names of its two director nominees on December 28, 2006. Openwave allowed the Harbinger nominees to appear on the ballot while expressly reserving its rights to challenge the nominations. In the election, Zucco received the most votes, followed by David C. Peterschmidt (Openwave's CEO), Gerald Held, and finally Breen. Harbinger, Zucco, and Breen are the plaintiffs in C.A. No. 2646–VCL, an action seeking either a new election or confirmation of Zucco's election.

Openwave challenges the validity of Harbinger's nominations. Bernard Puckett is the Chairman of Openwave's board of directors. Openwave and Puckett are the plaintiffs in C.A. No. 2690–VCL, an action seeking an order declaring the corporation's two director nominees, Peterschmidt and Held, were validly elected at its recent annual meeting of stockholders.

### B. *History of Openwave*

Openwave was created as a result of the merger of software.com and phone.com. In 1999, Openwave went public as phone.com. The company develops software for cellular telephones and markets the software to many leading phone manufacturers. Although negatively affected by the dot.com boom and bust, by April 2006 Openwave's stock price had risen to $23 per share. Following some missed estimates and disappointing results, Openwave's stock fell to a low of $5.91 per share in July 2006. At the time of this opinion, Openwave's stock is trading at approximately $8.36 per share.

### C. *Harbinger*

Harbinger is part of Harbert Management Corporation, a $7.5 billion hedge fund and management firm.[1] Though re-

---

**1.** *See* www.harbert.net/about.php (Announc-

ing "Harbert's committed capital and assets

ferred to as a singular entity, Harbinger is a $6.5 billion series of funds focused on special situations and distressed/event investing.[2] It is often referred to as a activist hedge fund for its proactive efforts to influence companies in which it invests. While sometimes only a passive investor, in many cases Harbinger seeks to maximize value through a variety of tactics, including placing its representatives on the board and even acquiring the target company.[3]

### D. Harbinger's Interest In Openwave

Harbinger began researching Openwave in March 2006 in order to determine whether it would be a suitable investment for its funds. It made its first purchases of Openwave stock on September 20, 2006 and by October exceeded the 5% threshold for filing beneficial ownership reports pursuant to section 13 of the Securities Exchange Act of 1934[4] and SEC Rule 13d–1 thereunder.[5] On October 5, 2006, Harbinger filed an initial disclosure of beneficial ownership with the Securities and Exchange Commission on Schedule 13G reporting that it held approximately

6.3 million shares of Openwave stock.[6] Harbinger filed on Schedule 13G rather than the more onerous Schedule 13D because it claimed to hold those shares for investment purposes only and not to influence the management or control of Openwave. On November 3, 2006, Harbinger amended its 13G filing to disclose its ownership of 10 million shares of Openwave, or just over 10.6% of Openwave's outstanding shares.[7] Harbinger's two 13Gs included a certification that required two Harbinger signatories to affirm that "to the best of my knowledge and belief, the securities referred to above were not acquired and are not held for the purpose of or with the effect of changing or influencing the control of the issuer of the securities."[8] Harbinger filed a Schedule 13D in late December 2006, disclosing its intention to mount a proxy contest to elect two new directors.[9]

### E. Openwave's Initial Reaction To Harbinger

Before November 1, 2006, Openwave took no action in response to Harbinger's Schedule 13G filing.[10] Indeed, neither the

under management have grown from $1.5 billion in 2002 to over $7.5 billion in the first quarter of 2007.").

2. See http://www.harbert.net/capital-partners/team.php.

3. It is clear based on the November 1 board presentation and Peterschmidt's testimony that the Openwave board was aware of Harbinger's investment tactics, at the latest, by November 1, 2006.

4. 15 U.S.C. § 78(m).

5. 17 C.F.R. § 240.13d-1 et seq.

6. JX 112A.

7. JX 112B. As of the time of trial, Harbinger owned approximately 13% of Openwave.

8. Tr. 204; JX 112A at 11; JX112B at 12.

9. Rule 13d–1 requires a filing disclosing "any plans or proposals which the reporting persons may have which relate to or would result in" a number of other activities pertinent to the operation or control of the issuer including any intent to nominate directors.

10. There was an earlier email, dated October 7, 2006, from one of the company's lawyers, Kenton J. King of Skadden, Arps, Slate, Meagher & Flom LLP, that forwarded to James Wu, Openwave's general counsel, a list of proxy solicitors and public relations firms. Wu responded in an email that evening that Georgeson Shareholders Communications, Inc. would be the company's proxy solicitor. The email was sent to King, Peterschmidt, and Harold Covert, the company's CFO. The evidence at trial proved that the use of a proxy solicitor was for Openwave's proposal to stockholders to renew its option grant authorization and not in response to Harbinger.

company's CEO nor its Chairman was familiar with Harbinger before the November 1, 2006 board meeting. At that meeting, the board learned about Harbinger and its involvement with other companies when lawyers from Openwave's outside counsel and representatives of Merrill Lynch made a presentation.[11] The presentation book (produced in litigation with heavy redactions) includes a section titled "Vulnerability Assessment, Overview of Harbert Management/Harbinger Capital."[12] The section details Harbinger's involvement in nine other corporations, eight of which occurred within a year of the November 1, 2006 meeting.[13]

### F. Harbinger's Activities Prior To November

The evidence at trial suggests that, while Harbinger took certain steps to help it become prepared if it later chose to become active, it did little to actually prepare for any potential proxy fight.[14] The one concrete step Harbinger took was to retain a small consulting operation, known as Treyex LLC, to identify important players in Openwave's area of business who might become useful resources in the event Harbinger decided to become active. The parties disagree as to whether Treyex's role included identifying suitable board members for Harbinger to nominate. Andrew Breen, under retainer as a consultant for Treyex, testified that he and Sanford Cohen, Treyex's principal, Treyex, and Harbinger were in frequent contact throughout the fall and into the winter of 2006. It was Treyex, for example, that contacted Zucco in November to see if he would be willing to serve if Harbinger put up a friendly slate of director nominees.[15] Harbinger also entered into a contract with Treyex that would award Treyex a success fee based on the performance of Harbinger's investment in Openwave.[16] However, beyond making contacts and acting as a consultant, Treyex did not take any concrete steps to secure board nominees for Harbinger until some time in December.

Howard Kagan, a managing director of Harbinger, also recalls asking Milbank, Tweed, Hadley & McCloy LLP, to look at Openwave's bylaws sometime between August and October to let him know if they saw anything "interesting" or "unusual."[17] This was reportedly done as part of the due diligence process for investment. There was no evidence that Milbank ever responded or, if they did, what advice was given to Harbinger about the Openwave bylaws.

---

In fact, prior to November 1, 2006, none of the board members who testified at trial knew of Harbinger or had any experience with a proxy contest. *See* JX 2.

11. JX 5.

12. *Id.* at p. 15.

13. Although in most of the instances cited in the presentation the outcome is listed as "pending," the presentation details Harbinger's termination of the Nacco/Applica merger and subsequent acquisition of Applica, Harbinger's role in bringing about the reorganization of Owens Corning, and Harbinger's acquisition of Crescent Jewelers out of bankruptcy. While Openwave's witnesses testified that they do not recall much about the book

or discussions of Harbinger at the meeting, it is clear that Harbinger was on their radar screen.

14. The court concludes in this opinion that prior to at least December 22, 2006 or even December 27, 2006, Harbinger made no final decision to nominate directors.

15. Tr. 112–15.

16. Ex. 40A. Breen would receive 50% of that fee under Treyex's agreement. Tr. 111.

17. Privilege was claimed on the substance of this conversation.

## G. *Openwave Eliminates The Open Board Seat*

On November 1, 2006, following the "Vulnerability" presentation, the Openwave board of directors amended the company's bylaws to reduce the number of board seats from seven to six.[18] The reason given by the company's officers was good "corporate governance."[19] The vacancy in the seventh seat was created more than a year earlier, in September 2005, when outside director and audit committee chair, Covert, stepped down from the board when he agreed to serve as the company's chief financial officer. In the 2005 election, Openwave ran only two candidates, even though a third directorship was open.

The evidence at trial showed that the board identified Steve McGowan, the former Chief Financial Officer of Sun Microsystems, as a potential candidate for the open seat and for the position of audit committee chair. After many months of efforts to recruit him, however, McGowan was still not able to commit to stand for election due to some uncertainty over the effect such service would have under his noncompete agreement with Sun. When it became clear that McGowan would not become available in time to stand for election at the January 2007 meeting, the board reduced the size of the board to eliminate the open seat with the hope that McGowan could be added to the board sometime in early 2007. The Openwave proxy statement did not disclose the possibility of adding McGowan to the board following the annual meeting.

McGowan's appointment was, in fact, far from certain. Although he had been in discussions with Openwave for some time, he had not agreed to serve due to issues concerning his noncompete agreement with Sun. The final payment due under the noncompete agreement would not occur until early 2007. While the board wanted McGowan, it was mere speculation that he would serve in the future. Indeed, before trial, McGowan informed the board that for personal reasons he would not serve.

## H. *Openwave's Annual Meeting Is Delayed*

In previous years, Openwave's annual meeting was held in November. For example, the 2005 meeting was held on November 22. In 2006, because of a review of the company's stock option grants delayed the company's publication of its financials, Openwave planned to announce its meeting date as soon as the financials were released. The company needed to file its financials on or before December 3, 2006 to avoid triggering certain default provisions in its indenture agreements.

Harbinger was aware of these facts, not only from the series of announcements made by the company, but also because on November 8, 2006, Covert informed Kagan that the company's Form 10–K was "basically done" and would be filed as soon as it received SEC clearance, probably by December 3, 2006. Thus, by early November it was clear to everyone that the company had a pressing deadline to announce its meeting by early December and the meeting would likely be held in the early part of the first quarter of 2007. Consistent with these expectations, on December 1, 2006, Openwave announced its annual meeting for January 17, 2007.

## I. *The Bylaws*

Openwave has two advance notification bylaws. First, Section 2.2, "Annual Meeting," provides in subsection (c) that "[i]n

---

**18.** Pretrial Stip. at II, 5.

**19.** Tr. 353.

addition to the requirements of Section 2.5, for nominations or other business to be properly brought before an annual meeting by a stockholder," notice must be given "not less than 20 days nor more than 90 days prior to the first anniversary of the preceding year's annual meeting...." Section 2.5, "Advance Notice of Stockholder Nominees," provides that "[o]nly persons who are nominated in accordance with the procedures set forth in this Section 2.5 shall be eligible for election as directors" and further specifies that "[t]o be timely" a notice of nomination must be delivered to the corporation "not less than 60 days nor more that 90 days prior to the meeting" unless "less than 60 days notice" of the date of the meeting is provided by the corporation. If less than 60 days notice is given, "notice by the stockholder to be timely must be so received not later than the close of business on the 10th day following the day on which notice of the date of the meeting was mailed or such public disclosure was made." These bylaws have remained unchanged since Openwave went public in 1999.

One possible reading of the bylaws is that they require compliance with both Section 2.2 and 2.5 and, therefore, the only deadline available to Harbinger in connection with the 2006 annual meeting was November 2, 2006. Another possible reading is that compliance with either deadline is permitted. Under the second interpretation, Harbinger could have given advanced notice by either November 2, 2006 or December 11, 2006. Openwave advances the latter interpretation of the bylaws. Harbinger does not take a position

20. Tr. 512–13.

21. Tr. 165.

22. JX 65.

other than to argue that the bylaws are confusing and contradictory.

### J. Harbinger Fails To Read The Bylaws Before The December 1, 2006 Announcement

No one from Harbinger testified to having read the bylaws before the December 1, 2006 announcement of the annual meeting. Kagan testified that based on his prior experience with proxy fights (all of it second-hand about events in which Harbinger was not directly involved) he did not think about advance notification of nominations before the December 1 announcement of the meeting date. He testified to this fact even though he earlier testified that he sent the bylaws to Milbank for review "sometime in the fall, sometime between August and October." [20] Joseph Anto, Kagan's subordinate, testified that he did not read the bylaws until around December 22, 2006.[21] On that date, Kagan emailed Anto and asked him to send him the bylaws and Anto forwarded to Kagan an electronic version of the bylaws from Openwave's website.[22] There is also no evidence that Zucco, Breen, or Treyex read the bylaws before December 1, 2006. Thus, no one, with the possible exception of Harbinger's counsel, ever looked at the bylaws before the date of the announcement.[23]

### K. Timing Of The Final Decision To Nominate Directors

While there was some preliminary activity by Harbinger representatives before the final decision in late December to engage in a proxy fight, Harbinger did

23. It is interesting to note that Peterschmidt and Covert also testified that they never read the bylaws. Puckett looked at them in the summer of 2006 and planned to make them more restrictive, but did not do so at that time.

nothing substantial to nominate directors before December 11, 2006. Harbinger disagrees, and points first to the December 6, 2006 meeting between Zucco and Kagan. The evidence is clear, however, that nothing of substance happened at that meeting. Zucco characterized the meeting as a "get to know me."[24] Kagan testified at trial that he very informally asked Zucco if he would be willing to stand for election, "subject to a million things" and that Zucco very tentatively agreed.[25] This is generally consistent with Kagan's deposition testimony that the formal approach to Zucco was not made until the second half of December.[26] Likewise, Zucco testified that he was not formally asked and he clearly did not agree to serve as Harbinger's nominee until sometime around December 22, 2006.

Second, the evidence to which Harbinger points to show that it even considered the effect of the bylaws on its ability to nominate directors before December 11, 2006 is also inconclusive and unpersuasive. Kagan testified in response to the court's questioning that he sought legal advice about the bylaws from Milbank "the week of the 4th through the 8th" of December.[27] The court then asked: "When did you get the advice?" Kagan responded: "The middle of the month" and "it took a long time to get back to [me]."[28] When his

own counsel took exception to this testimony, Kagan testified: "I don't have a clear recollection of when the advice came back from Milbank."[29] After further prompting by his counsel, Kagan then identified a redacted December 7 email from Milbank as the likely response. The court does not credit Kagan's testimony on this point. Thus, the court concludes that, while Harbinger sought advice about the Openwave advance notice bylaws from counsel before December 11, there is no credible evidence that Kagan received or considered the response before the middle of December.

The evidence meant to suggest that Harbinger acted diligently and yet was unable to nominate directors before the passage of the second deadline proves nothing. Indeed, the testimony, taken as a whole, shows that Harbinger had every opportunity to comply with either the November 2 or December 11 deadlines. When asked when Harbinger started looking for candidates for the Openwave board, Kagan testified that it was the "week of December 4th,"[30] an action triggered by the filing of the Form 10K and announcement of the annual meeting. Only then did Kagan start "talking about whether we might want to become more active and look for directors" and he finally decided to "look at the bylaws about advance nomi-

---

24. Tr 14–15.

25. Tr. 562 ("I informally asked would he be willing to stand subject to a million things and he said yes, subject to a million things early in December; and then we spent the month of December kind of getting our act together, deciding if he was the right person, me thinking about it, checking him out a little bit....").

26. At his deposition, Kagan was asked when he first asked Zucco "to become a candidate to the board" and Kagan responded "[i]n the second half of December." Tr. 563.

27. Tr. 437.

28. *Id.* While the official transcript does not reflect the second statement by Kagan, his counsel repeated it to him at Tr. 443 and it was heard by the court when originally stated by the witness.

29. Tr. 443. Previously the court had instructed counsel: "You just can't lead this witness in this area. I will not allow it." Tr. 435.

30. Tr. 469.

nation deadlines."[31] Kagan clearly testified that the decision to nominate was not made until a few days before Christmas. Once the decision was made, Harbinger was able to give notice and make the necessary Schedule 13D filing with 5 days. Far from being confused, Harbinger was simply dilatory in researching the advance notice bylaws. While Kagan testified he sent the bylaws to counsel months earlier, the evidence demonstrates he took no action on that advice, if there was any, and Harbinger chose to retain the public position of being a passive investor until the very last minute, by which time it was too late for it to muster its candidates and propose a slate.

### L. *Harbinger's Belated Nominations*

Harbinger belatedly delivered to Openwave the names of its two director nominees, Zucco and Breen, on December 28, 2006, just 20 days before the annual meeting. Openwave allowed the Harbinger nominees to appear on the ballot while expressly reserving its rights to challenge the nominations. In the foreshortened election contest, Zucco received the most votes, followed by Peterschmidt (Openwave's CEO), Held, and finally Breen.

### M. *The January 12, 2007 Press Release*

On January 9, 2007, Proxy Governance, one of three proxy advisory firms that make voting recommendations to investors, issued a report recommending that Openwave stockholders vote in favor of Peterschmidt and Held. Proxy Governance is regarded as the least influential of the three firms. The report acknowledged Harbinger had nominated its own slate, but detailed why Proxy Governance was supporting the incumbents. On January 12, 2007, Openwave issued a press release describing Proxy Governance's recommendation. This was done in response to a Harbinger press release announcing the other two proxy advisory firms issued reports supporting Zucco. Four days later, Proxy Governance announced that it changed its recommendation. No corrective press release was issued by Openwave. The evidence shows that both Harbinger and Openwave learned about Proxy Governance's change at the same time, via the Reuters announcement of the new Proxy Governance press release immediately before the election, after it was too late to issue another press release.

### II.

After the annual meeting, Harbinger filed suit, challenging the bylaws as improperly confusing, among other things. Openwave and Puckett responded by filing a Section 225 action on January 22, 2007. Harbinger then moved to amend its original complaint to change it to a Section 225 action as well. On January 29, 2007, Openwave moved to consolidate the cases and moved for summary judgment. The court granted consolidation into Openwave's Section 225 action, 2690–VCL.[32]

After discovery, Harbinger filed a second amended complaint raising additional claims based on Openwave's reduction in the size of the board at the November 1, 2006 meeting. While the motion to file the second amended complaint was pending, the court heard oral argument on Openwave's summary judgment motion on the issue of whether or not the hedge fund's nominations were compliant with the bylaws. That motion was denied on March 5,

---

31. Tr. 441.

32. While the court granted consolidation into the later filed action, this was done without prejudice to the positions of the parties. At trial, Harbinger acted as the plaintiff.

2007.[33] The court granted Harbinger's motion for leave to file a second amended complaint. It is that complaint which is operative in this consolidated action. Trial was held on March 12, 2007 and the parties submitted post-trial briefs on March 23, 2007.

## III.

Harbinger claims that its notification of its nominations was timely under the only reasonable interpretation of the bylaws possible in the circumstances. In the alternative, it contends Openwave breached its fiduciary duty by not waiving the bylaws or the bylaws were unenforceable in the circumstances. Basically, Harbinger contends it complied with the bylaws or they are of no effect and Zucco should be installed as a properly elected director.

In addition, Harbinger seeks to have this court strike down the election except with regard to Zucco. To support this prayer for relief, Harbinger alleges that the board manipulated the date, timing, and announcement of the meeting; the board improperly reduced the size of the board; the board failed to make adequate disclosure as to why they reduced the size of the board; and the January 12, 2007 press release was materially false and misleading. Harbinger maintains that the elimination of the vacant board seat was prompted by Harbinger's threat to the company and the board's reluctance to put McGowan up to a stockholder vote. Harbinger also maintains that the real reason for the reduction, the board's selection of McGowan and intention to add him to the board after the election, should have been disclosed. In this new election, if one is

ordered, Harbinger asks this court to preclude the 1.3 million shares of restricted stock from voting.[34] Thus, Harbinger seeks judgment seating Zucco as a director and ordering a new election for two more directors in addition to Zucco. Harbinger also seeks attorneys' fees and expenses incurred in bringing this action.

Openwave argues that the nominations on December 28, 2006 came too late. Under Openwave's reading of the bylaws, Harbinger had two opportunities to timely nominate its slate: (1) on or before November 2, 2006, pursuant to section 2.2(c) of the bylaws; and (2) within 10 days of the December 1, 2006 announcement of the meeting, pursuant to section 2.5 of the bylaws. Openwave also maintains that its board of directors had no duty to waive compliance with the advance notice provisions under the circumstances. Openwave further contends that Harbinger's other claims, relating to statements made during the proxy contest, the number of shares entitled to vote, and the reduction in the number of board seats, are moot since Harbinger's nomination of Zucco and Breen was improper. Openwave, therefore, requests that the court confirm Peterschmidt and Held as the properly elected directors. Openwave also seeks reasonable attorneys' fees and expenses in litigating the coordinated actions.

## IV.

### A. *The Bylaws*

■ Advance notice bylaws, provisions that require stockholders to provide the corporation with prior notice of their intent to nominate directors along with

---

**33.** *Openwave System, Inc. v. Harbinger Capital Partners Master Fund I, Ltd.,* 2007 WL 704943 (Del.Ch. Mar.5, 2007).

**34.** The 1.3 million shares of restricted stock would be of consequence only in a new election. The result of the election that took place are such that the outcome would be the same with or without the 1.3 million shares.

information about their nominees, are "commonplace."[35] Such bylaws are designed and function to permit orderly meetings and election contests and to provide fair warning to the corporation so that it may have sufficient time to respond to shareholder nominations. Advance notice bylaws are often construed and frequently upheld as valid by Delaware courts.[36] This court, in a case with bylaws similar but not identical to Openwave's bylaws, upheld a bylaw that operated to provide a 10–day window to give advance notice of nominations following the announcement of a meeting date.[37] However, this court is "vigilant in policing fiduciary misconduct that has the effect of impeding or interfering with the effectiveness of a stockholder vote."[38] "This is particularly the case in matters relating to the election of directors."[39] Thus, when advance notice bylaws unduly restrict the stockholder franchise or are applied inequitably, they will be struck down.[40]

### 1. Terms Of The Bylaws

▆▆▆▆ Delaware courts have repeatedly held that the rules used to interpret statutes, contracts, and other written instruments are applicable when construing corporate bylaws.[41] Under the applicable interpretation rules, if the bylaw's language is unambiguous, the court need not interpret it or search for the parties' intent.[42] The bylaw is construed as it is written, and the language, if simple and unambiguous, is given the force and effect required.[43] If the language is found to be ambiguous, doubt is resolved in favor of the stockholders' electoral rights.[44]

Openwave's bylaws include two provisions which purport to address advance notification of nominations for directors. The bylaws are not the most well drafted of corporate instruments. As a result, some ambiguity exists as to whether one or both of the provisions in the bylaws

---

**35.** *Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*, 728 A.2d 25, 43 (Del.Ch.1998), *aff'd on other grounds sub nom. Quickturn Design Sys., Inc. v. Shapiro*, 721 A.2d 1281 (Del. 1998).

**36.** *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1388 n. 38 (Del.1995) (bylaws upheld in hostile takeover situation); *Stroud v. Grace*, 606 A.2d 75, 95 (Del.1992) (upholding advance bylaw provisions); *Accipiter Life Scis. Fund, L.P. v. Helfer*, 905 A.2d 115, 127 (Del. Ch.2006) (upholding validity of 10 day advance notice provision).

**37.** *Accipiter*, 905 A.2d at 117.

**38.** *In re MONY Group, Inc. S'holder Litig.*, 853 A.2d 661, 673 (Del.Ch.2004).

**39.** *MM Cos. v. Liquid Audio, Inc.*, 813 A.2d 1118, 1127 (Del.2003).

**40.** *See, e.g., Hubbard v. Hollywood Park Realty Enters.*, 1991 WL 3151, at *11, (Del.Ch. Jan.14, 1991).

**41.** *Gentile v. SinglePoint Fin., Inc.*, 788 A.2d 111, 113 (Del.2001) (citing *Hibbert v. Holly-*

*wood Park, Inc.*, 457 A.2d 339, 343 (Del. 1983)).

**42.** *Hibbert*, 457 A.2d at 343 (citing *Nepa v. Marta*, 415 A.2d 470 (Del.1980)).

**43.** *Id.*

**44.** *See Harrah's Entmt., Inc. v. JCC Holding Co.*, 802 A.2d 294, 318 (Del.Ch.2002) ("Because the Specific Nomination Provision does not clearly limit Harrah's electoral rights, the residual doubt I harbor must be resolved in favor of permitting Harrah's to exercise the electoral rights it ordinarily would possess as a JCC stockholder.") (citing *McIlquham v. Feste*, 2002 WL 244859, at *5–6 (Del.Ch. Feb.13, 2002); *Rohe v. Reliance Training Network, Inc.*, 2000 WL 1038190, at *15–16 (Del. Ch. July 21, 2000); *Rainbow Navigation, Inc. v. Yonge*, 1989 WL 40805, at *4 (Del.Ch. Apr.24, 1989)); *see also Hubbard*, 1991 WL 3151, *5–6 ("The shareholders' right to vote includes the right to nominate a contesting slate.") (citing *Durkin v. Nat'l Bank of Olyphant*, 772 F.2d 55, 59 (3d Cir.1985)).

must be met because section 2.2(c) begins with "in addition to the requirements of section 2.5" and further in the text of section 2.2(c) there is a savings clause that states "to be timely ... notice must be filed within 10 days of the announcement of the annual meeting." While a literal reading would require that both provisions apply, in construing bylaws Delaware law requires interpretation in favor of shareholder rights.[45]

 Similarly, although there are some possible scenarios in which the Openwave bylaws would leave an unreasonably short time period for compliance, that is not the case here. Because Delaware law does not permit challenges to bylaws based on hypothetical abuses, the court will not consider those scenarios in judging Harbinger's compliance.[46] Instead, the court construes the bylaws in favor of shareholder rights and concludes that compliance with either the November 2, 2006 deadline or the later December 11, 2006 deadline would have been permissible. As evidenced at trial, Harbinger had ample opportunity to give advance notice of nominations by November 2, and certainly could have done so by December 11, 2006.

As the court stated in its summary judgment opinion, "trial could lead the court to conclude that Harbinger had a reasonable opportunity to submit its nominations and chose not to, either to gain the advantage of surprise or out of neglect."[47] Harbinger clearly had not one but two reasonable

opportunities to submit its nominations and missed those opportunities out of neglect or indecision, or perhaps to gain a tactical advantage by remaining a 13G filer even while it was preparing to wage a proxy contest. Whatever the reason, the facts are clear that Harbinger did not comply with any deadline under any reasonable reading of the bylaws. Harbinger does not seriously dispute this fact. Instead, it argues that its noncompliance with the bylaws should be excused because the bylaws are confusing or because the board had a duty to waive the bylaws under the circumstances.

## 2. Confusion Does Not Excuse Harbinger's Failure To Comply

■ At trial, not surprisingly, Harbinger's witnesses testified that the bylaws are confusing. What was surprising, however, was the complete lack of any evidence that Harbinger's failure to comply was caused in any way by such confusion. When asked to expand on this point, Kagan said little more than that the bylaws are confusing because he is unclear whether Harbinger had to comply with one provision or the other or both. Yet, Harbinger made no attempt to comply with either deadline and, indeed, produced no evidence that it even considered the issue of compliance until after both deadlines had passed. When asked about this, Kagan stated, "I did not specifically attempt to comply or

---

**45.** *Harrah's,* 802 A.2d at 310–11 ("It is better policy to read the charter in the manner most favorable to the free exercise of traditional electoral rights, in a situation in which the charter is susceptible to more than one reasonable interpretation."); *id.* at 312 ("[I]n the absence of clear and convincing evidence a court will resolve any residual doubt it harbors about an instruments' meaning in favor of, and against a reading that would limit, shareholders' fundamental electoral rights.").

**46.** *See Stroud,* 606 A.2d at 96 (holding that there was no basis for challenge to a bylaw based on "hypothetical" abuse); *Bebchuk v. CA, Inc.,* 902 A.2d 737, 741 (Del.Ch.2006) (declining to decide bylaw interpretation issue based on doctrine of ripeness).

**47.** *Openwave System, Inc.,* 2007 WL 704943, at *2.

not comply with them." [48] Moreover, according to him the existence of a November 2 or December 11 deadline "never came up." [49] The court is left to conclude that Harbinger's plea of confusion is merely a litigation device that bears no relationship to the timing of its decision to nominate directors after both possible deadlines for doing so had passed.

### 3. *Harbinger's Status As A 13G Filer Was Inconsistent With Nominating Directors*

Under the federal securities laws, when Harbinger formed an intent to nominate directors, it was required to amend its filing to disclose the additional information required by Schedule 13D.[50] Throughout the entire relevant time period, Harbinger was a 13G filer. It was not until December 28, 2006 that Harbinger filed a Schedule 13D,[51] revealing for the first time its intent to influence the management or control of the issuer.[52] Harbinger's Schedule 13G filings, meanwhile, included the required certification that its purchase of Openwave stock was "for investment purposes only" and not to exert influence or control over Openwave.

Harbinger's decision to report its beneficial ownership on Schedule 13G, rather than Schedule 13D, has some significance in this litigation. First, it substantially weakens Harbinger's argument that the Openwave directors regarded it as posing a threat to control as early as November 1, 2006. Second, Harbinger's status as a 13G filer further undermines its already weak argument that its failure to comply with the advance notification bylaws was caused by some confusion. On the contrary, Harbinger's continued representation that its purchases of Openwave shares were for investment purposes only is entirely consistent with the other evidence tending to show that Kagan did not begin to focus on the process of making board nominations until the middle of December and, so, could never have complied with either deadline.

### B. *Waiver Of The Bylaws Was Not Required*

■ Harbinger makes a last ditch attempt to salvage its own neglect by arguing that the Openwave board had a duty to waive the bylaws to permit its late nominations, notwithstanding Harbinger's complete disregard for the established deadlines. In support of this argument, Harbinger relies on "*Blasius* and its prog-

---

**48.** Tr. 518.

**49.** Tr. 522.

**50.** Section 13(d) of the Securities Exchange Act of 1934, 15 U.S.C § 78m(d).

**51.** *See Edgar v. MITE Corp.*, 457 U.S. 624, 628 n. 2, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982) (Section 13(d) of the Exchange Act of 1934 "requires a purchaser of any equity security registered pursuant to § 12 of the Securities Exchange Act, 15 U.S.C. § 78 l, to file a Schedule 13D with the [SEC] within 10 days after its purchases have exceeded 5% of the outstanding shares of the security.").

**52.** *See Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 286 F.3d 613, 616 (2d Cir.2002) ("A Schedule 13G is similar to a Schedule 13D, but it may be filed only by certain classes of purchasers and only if the purchasers have no intent to change or influence the issuer or to act in concert with others who so intend.") (cited in *NACCO Indust., Inc. v. Applica Inc.*, 2006 WL 3762090, at *6 (N.D.Ohio Dec.20, 2006)). Harbinger was a defendant in an action based on the truthfulness of its Schedule 13G filing and the timing of its change to a Schedule 13D filing in *NACCO v. Applica Inc*. The district court found "that Plaintiffs have not demonstrated a strong likelihood of success on the merits of their Section 13(d)." *Id.*

eny."[53] There is one case in Delaware law, *Hubbard v. Hollywood Park,* that found a duty for a board to waive an advance notice bylaw provision if a "radical shift in position, or a material change in circumstances" occurs after the deadline for nominations has passed.[54] In *Hubbard,* after the deadline for nominations had passed, the board of directors reached a settlement and accommodation with a stockholder who was engaging in a proxy contest seeking to oust the board. Other stockholders, upset by the shift in alliances, quickly sought to nominate another insurgent slate and the court concluded that the board had a duty to waive compliance with the bylaws in the circumstances to permit the new slate. No remotely similar circumstances present themselves here. The only change that occurred was the filing of Openwave's Form 10K. Not only did this occur before the second deadline, but Harbinger knew the filing was coming, and nothing of substance in it amounted to a "radical shift." *Hubbard* makes clear that there is no duty for the board to waive the advance notice provisions in these circumstances.

Harbinger also contends that the directors violated their fiduciary duties by failing to even consider waiving the bylaws. The facts do not support this contention. On the contrary, the evidence is that the board considered waiving the by-laws and declined to do so. The board minutes reflect that the board declined to grant a waiver because it felt that it would be unfair to the remaining stockholders to waive the bylaws for the benefit of Harbinger and that, if it did issue a waiver, the bylaws would lack meaning.

## C. Reduction In The Number Of Board Seats

Harbinger contends that the Openwave board improperly reduced the size of the board in response to Harbinger's filing of its initial Schedule 13G. Harbinger claims the board did this with the intention of nominating McGowan after the election to circumvent the election process. It also claims that the reduction in the number of board seats was designed to thwart Harbinger from nominating three director candidates to the board. Openwave responds that the reduction in the number of board seats was done for reasons of good corporate governance. Openwave also maintains that Harbinger's failure to timely give advance notice of its two candidates and the fact that it never intended to nominate a third candidate moots this claim.[55]

Harbinger points principally to the timing of the reduction to support its allegation that the reduction in board seats was done to undermine its ability to wage an

---

53. Harbinger Post-trial Br. 22.

54. *Hubbard,* 1991 WL 3151, *12.

55. Harbinger's failure to timely give advance notice to nominate its two candidates and the undisputed fact that Harbinger never considered nominating a third candidate raises serious questions about the justiciability of Harbinger's attack on this board decision. On the one hand, the reduction in the number of board seats exists apart from the nomination process itself. In reducing the number of seats, the Openwave directors acted before the deadline for advance notice to remove an opportunity for any stockholder to nominate a candidate. On the other hand, there is no evidence that Harbinger ever considered nominating three candidates or that the reduction interfered in any way with its ability to identify candidates and give advance notice of their nominations. Moreover, the board of directors promptly disclosed its action and neither Harbinger nor any other stockholder registered a complaint. Balancing these factors, the court nevertheless analyzes the evidence of record to determine whether there is any substantial evidence of a manipulation of the electoral process.

effective proxy fight. Indeed, the board acted only a few days after Harbinger filed its initial Schedule 13G and immediately after the board received a presentation from Merrill Lynch and its counsel on stockholder activism that included mention of Harbinger. These facts provide some circumstantial support for the proposition that the board was acting in response to a perceived Harbinger "threat." At the same time, the reduction took place at the regularly scheduled November 1 board meeting, a day before one possible deadline to give advance notice of nominees under the bylaws, and at a time when no stockholder had given notice of any nomination. These facts, examined as a whole, provide only weak support for the conclusion that the board reduced the number of authorized board seats in response to some concern that Harbinger would seek to nominate an opposing slate.

Openwave's explanation for the reduction is more complex. All of the board members who testified stated that the reduction was for reasons of good corporate governance: i.e. because it is bad practice to have unfilled open board seats. The board seat came open nearly a year earlier when Covert left the board to become the company's CFO. The seat was left open until November 2006 because the board was actively engaged in a search for a replacement to become audit committee chair. The board had, in fact, identified a qualified candidate, but he was unable to agree to stand for election or join the board until some time after the January 2007 election. When it became clear that he could not accept nomination in time to stand for the impending election, the board found itself without a candidate for the open seat and, thus, amended the bylaws to reduced the number of board seats.

Considering the evidence and the testimony of the directors, the court concludes that the reduction in the number of board seats was not a defensive measure designed to interfere with the stockholder franchise. The reduction in the number of board seats occurred nearly two months before Harbinger launched its proxy contest and was promptly disclosed. At the time the board seat was eliminated, Harbinger had just filed a Schedule 13G, indicating that its ownership of Openwave stock was for investment purposes only. At the time of the board reduction, Openwave knew only that Harbinger had acquired a significant stake in Openwave's common stock and that Harbinger was an activist hedge fund that in some circumstances attempted to influence the control of the companies it invested in, but in others was a passive investor. When this information is combined with Harbinger's Schedule 13G filing for investment purposes only, it is a reasonable conclusion that Harbinger was not a credible threat to the existing board's control of Openwave at the time of the board reduction. The testimony at trial also demonstrated that, at the time of the November 1, 2006 board meeting, none of the board members considered Harbinger to be a threat and had not considered the possibility of a proxy fight.

In light of these conclusions, the court will not impose the heightened standard of review applied to takeover defenses[56] or attempts to circumvent the stockholder franchise.[57] In both *IBS v. Seidman*[58] and

---

**56.** *Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d 946 (Del.1985); *see also Unitrin, Inc. v. American General Corp.,* 651 A.2d 1361, 1378 (Del.1995) ("This Court has been and remains assiduous in its concern about defensive ac-

tions designed to thwart the essence of corporate democracy by disenfranchising stockholders.").

**57.** *Blasius Indus., Inc. v. Atlas Corp.,* 564 A.2d 651, 659, 669 (Del.Ch.1988) ("There exists in

*MM v. Liquid Audio*,[59] the cases most heavily relied upon by Harbinger, the incumbent board took action to counter known proxy threats. In *Hubbard v. Hollywood Park*, where this court found the incumbent directors had a duty to waive an advance notice bylaw, the insurgents filed a Schedule 13D a month and a half before actively taking steps to influence the board.[60] If Harbinger had filed a Schedule 13D rather than a Schedule 13G, the board's action in eliminating the vacant seat might well be subjected to more searching scrutiny.[61] Harbinger did not.

Turning now to the board's reason for eliminating the vacant seat, the court credits the testimony that the board was advised and believed that it is good corporate governance to eliminate the vacant board seat. An open board seat can send a signal to the market that the board is unable to find a qualified candidate to fill the slot. Thus, an open board seat can reflect poorly on the corporation and its board. Moreover, it creates a situation where any candidate, nominated by any stockholder, can win a seat on the board simply by virtue of running unopposed. The testimony at trial established that the board members, especially Puckett, were concerned with the corporate governance issues, and that they acted in good faith, after due consideration, in making their decision.

### D. Board Seat Reduction As A Disclosure Violation

 Harbinger also claims that Openwave's proxy material was false and misleading because it failed to disclose a "plan" to appoint McGowan to the board immediately after the election. Directors of Delaware corporations must "disclose fully and fairly all material information within the board's control when they seek shareholder action." [62] "An omitted fact is only material if there is a substantial likelihood that it would be considered important in a reasonable shareholder's deliberation and decision making process before casting his or her vote." [63] An omitted fact is material only when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.[64] Disclosures must be

Delaware a general policy against disenfranchisement." "The shareholder franchise is the ideological underpinning upon which the legitimacy of directorial power rests."); *see also Paramount Comm'ns, Inc. v. QVC Network, Inc.*, 637 A.2d 34, 42 (Del.1994) ("Because of the overriding importance of voting rights, this Court and the Court of Chancery have consistently acted to protect shareholders from unwarranted interference with such rights."); *Wisconsin Inv. Bd. v. Peerless Systems Corp.*, 2000 WL 1805376, *7–8 (Del.Ch. Dec.4, 2000) (discussing *Blasius* ).

58. *IBS Fin. Corp. v. Seidman & Assoc's, L.L.C.*, 136 F.3d 940, 946 (3d Cir.1998) (relying on Delaware law to interpret New Jersey law finding improper manipulation of the number of board seats).

59. *MM Cos. v. Liquid Audio, Inc.*, 813 A.2d 1118, 1127 (Del.2003).

60. 1991 WL 3151, at *2.

61. *Id.* (noting the filing of a Schedule 13D by opposition).

62. *Arnold v. Soc'y for Savings Bancorp., Inc.*, 650 A.2d 1270, 1277 (Del.1994) (quoting *Stroud*, 606 A.2d at 84).

63. *In re Netsmart Tech., Inc.*, 924 A.2d 171, 199, 2007 WL 1576151, *21 (Del.Ch. Mar.14, 2007) (citing *Zirn v. VLI Corp.*, 621 A.2d 773, 778–79 (Del.1993)).

64. *Zirn*, 621 A.2d at 778–79 (citing *TSC Indust., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

"materially complete." [65] However, "Delaware law does not require disclosure of inherently unreliable or speculative information." [66]

■ The facts presented at trial proved that the directors had no fixed intention to appoint McGowan after the annual meeting and that their desire to appoint McGowan to the board was simply that, a desire. At the time of the reduction in the board from seven seats to six, there was no certainty that McGowan would be willing or able to serve in the future. It was not a situation where Openwave had an agreement with him to join the board that would take effect once his noncompete agreement expired. To the contrary, Openwave had been actively pursuing McGowan for nearly a year without concrete results. It is true that the Openwave directors hoped to install McGowan once he became available and would agree to serve, but this was far from certain. Everything about McGowan's potential to serve on the board was speculative and aspirational.

Considering the testimony and other evidence, the court concludes that the proxy material was not false or misleading for failing to disclose information about the company's dealings with McGowan. That situation was far too unsettled and uncertain to require disclosure under Delaware law. Simply put, there was no agreement or understanding with McGowan about his future service on the Openwave board of directors. Indeed, not surprisingly, McGowan eventually informed the corporation that he was unable to serve for personal reasons.

### E. *Harbinger's Other Claims Are Moot*

■ A matter may become moot "if the legal issue in dispute is no longer amenable to a judicial resolution; or, if a party has been divested of standing." [67] Since there were no other candidates properly nominated other than management's slate, Harbinger's claims of manipulation arising out of the conduct of the contest are moot. Specifically, Harbinger's claims that the restricted stock was improperly voted and that the January 12, 2007 press release was misleading are moot because any potential influence they had on the election was of no effect, since there was simply no one else for stockholders to vote for other than the incumbent candidates. While this court could envision a scenario where electoral fraud rose to such a level that the entire election would be invalid, even absent competing nominees, this is not the case here.

### F. *Attorneys' Fees*

■ Both parties seek attorneys' fees in this action. The court denies Harbinger's request for fees because it is the losing party in this litigation. While the award of attorneys' fees is "unusual" relief,[68] the Court of Chancery has broad discretion in making such awards.[69] Dela-

65. *In re Pure Resources, Inc. S'holders Litig.*, 808 A.2d 421, 448 (Del.Ch.2002) ("When a document ventures into certain subjects, it must do so in a manner that is materially complete and unbiased by the omission of material facts.").

66. *Arnold*, 650 A.2d at 1280; *see also Loudon v. Archer–Daniels–Midland Co.*, 700 A.2d 135, 145 (Del.1997) ("Speculation is not an appropriate subject for a proxy disclosure.").

67. *General Motors Corp. v. New Castle County*, 701 A.2d 819, 821 (Del.1997).

68. *Barrows v. Bowen*, 1994 WL 514868, at *2 (Del.Ch. Sept.7, 1994) (citing *Weinberger v. U.O.P., Inc.*, 517 A.2d 653, 656 (Del.Ch. 1986)).

69. *Kaung v. Cole Nat. Corp.*, 884 A.2d 500, 506 (Del.2005) (citing *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542,

ware courts follow the American Rule.[70] Under the American Rule, litigants are expected to bear their own costs of litigation absent some special circumstances that warrant a shifting of attorneys' fees, which, in equity, may be awarded at the discretion of the court.[71] However, there are several recognized exceptions to the American Rule.[72] One exception is where the losing party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons," the court will award attorneys' fees to "deter abusive litigation in the future, thereby avoiding harassment and protecting the integrity of the judicial process." [73] The award of attorneys' fees is based on an individualized inquiry into the facts presented.[74]

 Openwave requested its attorneys' fees as a matter of course. Openwave's request for fees is denied because there is no evidence of bad faith on behalf of Harbinger in the conduct of this litigation. At summary judgment, the court denied Openwave's motion on the basis that Harbinger would introduce evidence to show how it was confused by the bylaws. While Harbinger failed to prove this fact at trial and the evidence introduced leads the court to the conclusion that Harbinger failed to take any substantive action to give advanced notice, Harbinger's conduct does not rise to the level of bad faith. Harbinger introduced the testimony of its witnesses that they were confused by the bylaws. Although the court concludes that any such confusion did not cause Harbinger's failure to comply with the deadlines, its witnesses' subjective beliefs were a reasonable basis for Harbinger to oppose summary judgment. Therefore, the parties' claims for attorneys' fees are denied.

## V.

For the foregoing reasons, judgment will be entered in favor of the defendants. Counsel for the defendants are directed to submit a form of order in conformity with this opinion within ten days.

---

547 (Del.1998)); *Wilmington Medical Center v. Severns,* 433 A.2d 1047, 1049–50 (Del. 1981); *Bodley v. Jones,* 65 A.2d 484, 486 (Del.1948); 10 *Del. C.* § 5106.

**70.** *Brice v. State,* 704 A.2d 1176, 1178 (Del. 1998).

**71.** *Johnston,* 720 A.2d at 545; *Beck v. Atlantic Coast PLC,* 868 A.2d 840, 850 (Del.Ch.2005) (citing *Barrows,* 1994 WL 514868, at *1).

**72.** *Goodrich v. E.F. Hutton Group, Inc.,* 681 A.2d 1039, 1043–44 (Del.1996).

**73.** *Brice,* 704 A.2d at 1178 (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S.

240, 258–59, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975) and *Schlank v. Williams,* 572 A.2d 101, 108 (D.C.1990)).

**74.** *Beck,* 868 A.2d at 851 ("There is no single standard of bad faith that warrants an award of attorneys' fees in such situations; rather, bad faith is assessed on the basis of the facts presented in the case. Courts have found bad faith conduct where parties have unnecessarily prolonged or delayed litigation, falsified records, or knowingly asserted frivolous claims. Specific behavior that has been found to constitute bad faith in litigation includes misleading the court, altering testimony, or changing position on an issue.") (citations omitted).