IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BLACKROCK CREDIT ALLOCATION INCOME TRUST, BLACKROCK NEW YORK MUNICIPAL BOND TRUST, BLACKROCK ADVISORS, LLC, RICHARD E. CAVANAGH, KAREN P. ROBARDS, MICHAEL J. CASTELLANO, CYNTHIA L. EGAN, FRANK J. FABOZZI, HENRY GABBAY, R. GLENN HUBBARD, W. CARL KESTER, CATHERINE A. LYNCH, ROBERT FAIRBAIRN, and JOHN M. PERLOWSKI, | § § § § § § § § § § § § § § | No. 297, 2019 |
| Defendants-Below, Appellants, | § § § § § | Court Below: Court of Chancery of the State of Delaware |
| v. | § § | |
| SABA CAPITAL MASTER FUND, LTD. | § § § § | C.A. No. 2019-0416-MTZ |
| Plaintiff-Below, Appellee. | § § § | |

Submitted: December 4, 2019
Decided: January 13, 2020

Before **SEITZ**, Chief Justice; **VALIHURA** and **TRAYNOR**, Justices.

Upon appeal from the Court of Chancery. **AFFIRMED** in part, **REVERSED** in part, and **REMANDED.**

William M. Lafferty, Esquire, D. McKinley Measley, Esquire, Thomas P. Will, Esquire, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware. Of Counsel: Tariq Mundiya, Esquire, (*argued*) Sameer Advani, Esquire, Alexander L. Cheney, Esquire, Brittany M. Wagonheim, Esquire, Willkie Farr & Gallagher LLP, New York, New York for Appellants BlackRock Credit Allocation Income Trust and BlackRock New York Municipal Bond Trust.

Carmella P. Keener, Esquire, Rosenthal, Monhait & Goddess, P.A., Wilmington, Delaware. Of Counsel: Carol S. Shahmoon, Esquire, Gregory E. Keller, Esquire, (*argued*) Shahmoon Keller PLLC, New York, New York for Appellee.

**VALIHURA**, Justice:

The issue we confront in this case is whether under their respective bylaws, two closed-end investment funds, BlackRock Credit Allocation Income Trust ("BTZ") and BlackRock New York Municipal Bond Trust ("BQH", and with BTZ, the "Trusts"), properly excluded their shareholder, Saba Capital Master Fund, Ltd. ("Saba"), from presenting its slate of dissident trustee nominees for election at the respective annual meetings. The Court of Chancery held that such exclusion was improper. It reasoned that the supplemental questionnaires that Saba's nominees were asked to complete (the "Questionnaire" and collectively, the "Questionnaires"), exceeded the bylaws' scope and, thus, the Trusts were "not permitted to rely on the five-day deadline for Saba's compliance with that request."[1] It also held that laches did not bar Saba's claims for equitable relief.

On appeal, the Appellants contend that the Court of Chancery erred by issuing an injunction requiring the Trusts to count the votes for Saba's nominees at the respective annual meetings, since they claim that Saba's nominees were ineligible for election because of their failure to timely provide supplemental information in accordance with the clear and unambiguous bylaws. Appellants also contend that the court erred in holding that Saba's claims for equitable relief were not barred by laches.

---

[1] *Saba Capital Master Fund, Ltd. v. Blackrock Credit Allocation Income Tr.*, 2019 WL 2711281, at *6 (Del. Ch. June 27, 2019) [*hereinafter* Opinion]. The Court of Chancery drew "the undisputed facts from the Amended Complaint, and address[ed] only those facts necessary to resolve the expedited claims." *Id*. at *1. The Court of Chancery also considered certain documents attached to transmittal affidavits filed in connection with the injunction proceedings.

On appeal, the parties continue to dispute whether the Questionnaire is the type of "necessary" and "reasonably requested" subsequent information that falls within the meaning of Article I, Section 7(e)(ii) of the Trusts' bylaws. But, importantly, the parties both agree that at least part of the Questionnaire is within the bounds of Section 7(e)(ii), and part is not. It is also undisputed that Saba, upon receipt of the request for supplementation, did not contact the Trusts or seek relief from the deadline. Instead, it let the deadline pass and then complained, raising a number of excuses for not complying with the deadline. We agree with the Vice Chancellor that Section 7(e)(ii) is clear and unambiguous. But we disagree that Saba should be excused from complying with the Bylaws' clear deadline. Further, we affirm the Vice Chancellor's holding as to laches. Accordingly, we **AFFIRM** in part, and **REVERSE** in part, and **REMAND** for further proceedings.

## I. BACKGROUND

Defendant-Appellants BTZ and BQH are Delaware statutory trusts registered as closed-end investment funds under the federal Investment Company Act of 1940. Defendant-Appellant BlackRock Advisors, LLC advises the Trusts. The individual Defendant-Appellants comprise the Trusts' boards of trustees (the "Boards"). We refer to BTZ, BQH, BlackRock Advisors, LLC, and the individual Defendant-Appellants, collectively, as the "Appellants."

Plaintiff-Appellee Saba, a Cayman Islands company, holds shares of both Trusts. Saba is managed by Saba Capital Management, L.P., whose managing member is Boaz Weinstein.

4

*A. The Bylaws*

Article I, Section 7 ("Section 7") and Article II, Section 1 ("Section 1") of the bylaws of BTZ and BQH (collectively, the "Bylaws") are relevant to this appeal. Both sets of Bylaws are identical with respect to those sections.

Section 7, entitled "Nomination of Directors," sets forth the method by which shareholders can nominate trustees to the Board.[2] The section begins by stating that "[o]nly persons who are nominated in accordance with the following procedures shall be eligible for election as directors of the Fund."[3] Section 7(f) further states that "[n]o person shall be eligible for election as a director of the Fund unless nominated in accordance with the procedures set forth in this Section 7 of this Article I."[4]

When nominating directors for election, under Sections 7(a)–(c), stockholders are required to give timely written notice of a nomination (a "Nomination Notice").[5] Section 7(d) enumerates what a Nomination Notice must contain, which includes "information to establish to the satisfaction of the Board of Directors that the Proposed Nominee satisfies the director qualifications as set out in Section 1 of Article II."[6] It must also contain information required by federal securities laws, including information relating to whether

---

[2] In the record, "Board of Directors" and "Board of Trustees" are used interchangeably, as are "Director" and "Trustee."

[3] App. to Opening Br. at A406 (BQH Bylaws Art. I, § 7(a)), A432 (BTZ Bylaws Art. I, § 7(a)).

[4] *Id.* at A409 (BQH Bylaws Art. I, §7(f)), A434 (BTZ Bylaws Art I, § 7(f)).

[5] *Id.* at A406–A407 (BQH Bylaws Art. I, § 7(a)–(c)), A432–A433 (BTZ Bylaws Art. I, § 7(a)–(c)).

[6] *Id.* at A407 (BQH Bylaws Art. I, § 7(d)(i)(C)(6)), A433 (BTZ Bylaws Art. I, § 7(d)(i)(C)(6)).

5

the nominee is an "interested person" under the Investment Company Act of 1940 (the "1940 Act"), and information "that would be required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for election of directors in an election contest pursuant to Section 14 of the [Securities Exchange Act of 1934]."[7]

Section 7(e)(ii), the provision in the Bylaws at issue here, reads as follows:

A shareholder of record, or group of shareholders of record, providing notice of any nomination proposed to be made at an annual meeting or special meeting in lieu of an annual meeting shall further update and supplement such notice, *if necessary*, so that:

(i)  the information provided or required to be provided in such notice pursuant to this Section 7 of this Article I shall be true and correct as of the record date for determining the shareholders entitled to receive notice of the annual meeting or special meeting in lieu of an annual meeting, and such update and supplement shall be delivered to or be mailed and received by the Secretary at the principal executive offices of the Fund not later than five (5) business days after the record date for determining the shareholders entitled to receive notice of such annual meeting or special meeting in lieu of an annual meeting; and

(ii)  any subsequent information *reasonably requested* by the Board of Directors *to determine that the Proposed Nominee has met the director qualifications as set out in Section 1 of Article II is provided*, and such update and supplement shall be delivered to or be mailed and received by the Secretary at the principal executive offices of the Fund *no later than five (5) business days* after the request by the Board of Directors for *subsequent information* regarding director qualifications has been delivered to or mailed and received by such shareholder of record, or group of shareholders of record, providing notice of any nomination.[8]

---

[7] *Id.* at A407 (BQH Bylaws Art. I, § 7(d)(i)(D)), A433 (BTZ Bylaws Art. I, § 7(d)(i)(D)).

[8] *Id.* at A408 (BQH Bylaws Art. I, § 7(e)), A434 (BTZ Bylaws Art. I, § 7(e)) (emphasis added).

6

Section 1 of Article II, entitled "Number and Qualifications," provides an expansive list of qualifications that prospective trustees must meet to serve on either of the Boards. This section lists trustee requirements and restrictions relating to limits on directorship positions, potential conflicts, criminal offenses, prohibited conduct, and various ineligibility provisions contained in certain federal securities laws.[9] The parties agreed in the proceedings below "that some of those qualifications relate to parallel requirements under the Investment Company Act of 1940."[10]

### B. The Nominations Dispute

On or about March 30, 2019, Saba delivered a timely Nomination Notice to the Trusts pursuant to Section 7 to nominate four individuals for election to both of the Trusts' Boards. The Nomination Notice, according to the Court of Chancery, generally contained the information required under Section 7, "albeit at a high level and without much context or explanation."[11]

Approximately three weeks later, on April 22, 2019, the Trusts' counsel, Willkie Farr & Gallagher LLP ("Willkie"), emailed Saba in separate emails requesting additional information. Willkie's transmittal email request stated:

> Pursuant to Article I, Section 7 of the bylaws of the Fund, I am writing on behalf of the Board of Trustees of the Fund (the "Board") to request additional information with respect to the nominees submitted by Saba Capital Master Fund, LTD (the "Shareholder") for election at the Fund's 2019 shareholder meeting. Please have each of the proposed nominees

---

[9] *See id.* at A413–A415 (BQH Bylaws Art. II, § 1), A439–A441 (BTZ Bylaws Art. II, § 1).

[10] *Opinion*, 2019 WL 2711281, at *1.

[11] *Id.* at *2.

> complete and sign the attached questionnaire and return it to my attention with a copy to Janey Ahn, Secretary of the Fund.
>
> The Board and the Fund each reserves all rights and remedies with respect to the subject matter of this correspondence, including without limitation the right to request additional information from the Shareholder or from the Shareholder's proposed nominees.[12]

Although it referred to Section 7 generally, the email did not specifically reference Section 7(e)(ii) or the five-business-day response deadline. As explained below, the attached Questionnaire contained a mix of questions, with a significant number of them directly relating to the Section 1 qualifications. Under Section 7(e)(ii), the responses were due on April 29, 2019.

Saba did not respond to the information request before the due date. On the morning of May 1, 2019, seven business days after making the information request, Willkie emailed Saba on behalf of BTZ declaring that because the Questionnaires have not been completed and returned, "the [Nomination Notice] is invalid under [BTZ's] bylaws and Delaware law."[13]

That evening, for the first time since sending the April 22, 2019 email inquiry, the Trusts received a response. Saba's counsel, Schulte Roth & Zabel LLP ("Schulte Roth"), emailed Willkie contesting the invalidity determination. It contended that the Trusts' "assertion is incorrect, for several reasons,"[14] and claimed that the Trusts' rejection of the nominations was based "on an overly narrow interpretation of the Bylaws [and] is a

---

[12] App. to Opening Br. at A518, A567 (Willkie April 22, 2019 Emails).

[13] *Opinion*, 2019 WL 2711281, at *3.

[14] App. to Opening Br. at A621, A624 (Schulte Roth May 1, 2019 Letters).

8

transparent attempt to entrench the current Board by artificially imposing restrictions on the shareholder franchise."[15]

It then defended Saba's lack of response on several grounds. First, Schulte Roth argued that Saba was not obligated to respond to the Questionnaire under the Bylaws because the Trusts sought duplicative information, as the Nomination Notice already contained information sufficient to determine whether the nominees were qualified to serve as a director of an investment company.[16] It further explained that the Trusts could determine, from the information provided in the Nomination Notice, whether the nominee is an "interested person" pursuant to the relevant provisions of the 1940 Act.[17] Schulte Roth also asserted that the information requested was unreasonable because it was duplicative, and to the extent there were any non-duplicative requests, those were "particularly unreasonable" because it refers to information "unrelated to the issue of whether the nominees meet the director qualifications as set forth in the Bylaws."[18]

Schulte Roth asserted, assuming *arguendo* that a response was required, that the five business day deadline had not yet been triggered (Saba's "Trigger Theory"). They articulated that position as follows:

> Second, even assuming, *arguendo*, that a response is required, the time for providing the response has not yet run. Article 1, Section 7(e)(i) of the Bylaws provides that a shareholder making a nomination has an obligation to "update and supplement" its notice so that the information provided therein is true and correct as of the record date for the annual meeting for

---

[15] *Id.* at A622, A625.

[16] *Id.* at A621, A624.

[17] *Id.* at A622, A625.

[18] *Id.*

9

which the notice is being provided, and any such update or supplement must be delivered no later than five business days after such record date. The reference to "subsequent information" in Section 7(e)(ii) plainly indicates that the information called for in that section is to be provided *after* the "update and supplement" required by Section 7(e)(i) *and* the record date. As such, because the record date has not yet passed, the Board's request was premature.[19]

In other words, Schulte Roth understood the two subsections of Section 7(e) to be a conjunctive sequence whereby a request under Section 7(e)(ii) could be made only after the events in Section 7(e)(i) (that is, an update and supplement and the passing of the record date) had occurred. Indeed, Saba's counsel told the Court of Chancery that Saba and the nominees had begun filling out the Questionnaires on April 22, but did not believe the Questionnaires were subject to the five-business-day deadline under Section 7(e)(ii).[20] It nevertheless attached completed Questionnaires to its email response "[i]n an effort to resolve this matter amicably."[21]

On May 7, Willkie responded to Schulte Roth and reiterated that the Nomination Notice was invalid because Saba failed to timely submit the Questionnaires, and that the Boards, in the exercise of their business judgment, determined not to waive the deadlines.[22] Willkie noted in its response that Saba's contentions in their May 1 response "appear to be litigation positions that Saba hastily concocted as soon as it realized that it had missed a

---

[19] *Id.*

[20] *Opinion*, 2019 WL 2711281, at *3.

[21] App. to Opening Br. at A622, A625 (Schulte Roth May 1, 2019 Letters).

[22] *Id.* at A818–A820 (Willkie May 7, 2019 Letter).

concrete April 29, 2019 deadline established pursuant to the Bylaws."[23]  Willkie further responded that the Bylaws at issue had been in effect since September 2010,[24] and that Saba's Trigger Theory was "nonsensical."[25]  Willkie then explained that the Nomination Notice contained declaratory statements with no supporting detail, and so it needed more information regarding whether the nominees were "interested persons" under the 1940 Act.[26]  It further pointed to inaccuracies or omissions in the submitted Questionnaires,[27] and asserted that "we do not believe you can seriously contend that enforcement of a pre-existing five business day deadline in a bylaw seeking more information about nominees to the board of a public regulated entity is evidence of 'entrenchment.'"[28]

Saba responded later that day arguing that the nominations were not invalid under the Bylaws and that the Boards were breaching their fiduciary duties.[29]  Two days later, on May 9, 2019, Saba sent another letter reasserting that its nominations were valid, and provided explanations for the deficiencies in the Questionnaires the Trusts had noted in its May 7, 2019 correspondence.[30]

---

[23] *Id.* at A819.

[24] *Id.* at A818.  BQH's Bylaws are dated October 28, 2010 and BTZ's Bylaws are dated October 28, 2016.

[25] *Id.* at A820.

[26] *Id.*

[27] *See id.* at A820–A822.

[28] *Id.* at A822.

[29] *See id.* at A825–A830 (Saba's May 7, 2019 Letter).

[30] *See id.* at A835–A840 (Saba's May 9, 2019 Letter).

A proxy contest followed. On May 10, 2019, BQH filed its preliminary Schedule 14A with the SEC. The preliminary proxy stated that "[t]he Board has determined the nominations of the Hedge Fund Individuals to be invalid as a result of Saba's hedge fund failing to comply with the Trust's By-Laws."[31] It also urged stockholders "not to sign or return any proxy card sent to you by Saba, even to withhold votes on the Hedge Fund Individuals or to vote against the hedge fund's proposal, because doing so will cancel out any previously submitted votes on the Trust's [] proxy card."[32] Saba filed its competing BQH preliminary proxy on May 14, 2019, which asserted that its "nomination was properly and timely submitted under the Amended and Restated Bylaws of the Fund (the 'Bylaws') and that the Fund's assertions to the contrary are incorrect."[33]

BTZ filed its preliminary proxy on May 20, 2019, expressing the same position as to Saba's nominations. Saba filed its BTZ preliminary proxy the next day. BQH filed its definitive proxy on May 24, 2019, announcing that the annual meeting would be held on July 18, 2019, and instructing stockholders to "discard any proxy card from Saba as any votes with respect to [its nominees] will not be counted at the meeting."[34] Saba filed its BQH definitive proxy on May 28. On June 5, 2019, BTZ filed its definitive proxy and set

---

[31] *Id.* at A843 (BQH 2019 Prelim. Proxy).

[32] *Id.* at A846.

[33] *Id.* at A902 (Saba's BQH 2019 Prelim. Proxy). Saba's proxies were being solicited by Saba Capital Management, L.P., Boaz Weinstein, and Saba's nominees.

[34] *Opinion*, 2019 WL 2711281, at *3.

its annual meeting date for July 8, three weeks earlier than the prior year's July 30 meeting date.[35]

*C. The Questionnaire*

The scope of the Questionnaire is at the center of this dispute. The cover page of the Questionnaire states:

> This Annual Questionnaire will provide BlackRock with the information needed to:
>
> - prepare regulatory filings, including registration statements filed with the U.S. Securities and Exchange Commission, amendments to such registration statements, annual reports and proxy statements;
>
> - determine whether a Director or nominee may be an "interested person" of a Fund set forth in Schedule I (a "Fund"), as that term is defined under the Investment Company Act of 1940, as amended, and therefore not an independent Director;
>
> - evaluate potential conflicts of interest;
>
> - update records; and
>
> - comply with other applicable laws and regulations.[36]

There are two parts to the Questionnaire—the general questionnaire, and an "Annex A." The Questionnaire instructs that, in addition to completing the general questionnaire, "[i]f you are nominated to serve as a Director at this year's Annual Meeting of Shareholders, please complete <u>Annex A – Supplemental Questionnaire for Nominees</u>."[37] The Questionnaire as a whole, when counting the sub-questions, consists of nearly one-hundred

---

[35] *Id.*

[36] App. to Opening Br. at A519, A568 (Questionnaire).

[37] *Id.* at A520, A569.

questions.[38]  The Trusts admit that the Questionnaire was not "crafted for this instance"[39] and that some questions do not strictly relate to the Bylaws.[40]  However, the Trusts claimed that none of those questions were improper because "they relate to the Code of Federal Regulations with respect to proxy statements, with respect to Section 17(d) of the '40 Act," and to "federal law compliance for potential directors."[41]

The Court of Chancery requested that the parties provide demonstratives "categorizing whether each of the subpart questions in the Questionnaire related to Section 1's director qualifications or some other purpose."[42]  Saba claimed that only one-third sought information relevant to the Section 1 qualifications, whereas the Trusts contended that two-thirds of the questions were relevant to Section 1.[43]  Thus, the parties agreed that at least one-third of the questions were not directly related to the enumerated qualifications, and that at least one-third of the questions were.

---

[38] *Opinion*, 2019 WL 2711281, at *2 (stating that, "[d]epending on sub-parts, Saba counts ninety-five questions on the Questionnaire, while Defendants count ninety-seven.").

[39] App. to Opening Br. at A1172 (Argument Tr.).  The Court of Chancery sought clarification on whether the Questionnaire is a standard questionnaire that directors are instructed to complete every year, and whether the Annex A portion was "bespoke to these particular nominees." Appellants confirmed that this was a standard questionnaire and the Annex A was not tailored to the nominees.  *Id.*

[40] *Id.* at A1170.  At oral argument, Appellants stated that those questions not tethered to Article II, Section 1 "went to the qualifications or the capacity of these individuals to serve as potential trustees," and that it is "exactly right" that the five business day deadline does not apply to those questions under the Bylaws.  *See* Oral Argument Video, 3:15–3:30, https://livestream.com/accounts/5969852/events/8915743/videos/199548715.

[41] App. to Opening Br. at A1170–A1171.

[42] *Opinion*, 2019 WL 2711281, at *5.

[43] *Id.*; *see* App. to Opening Br. at A1088–A1105 (Trusts' Demonstrative), App. to Answering Br. at B106–B135 (Saba's Demonstrative).

*D. The Court of Chancery Proceedings*

Saba filed its initial complaint with the Court of Chancery on June 4, 2019, more than three weeks after the Trusts' first preliminary proxy statement was filed, and nearly five weeks after it first learned of the Trusts' position that its nominees were ineligible. Saba asserted four counts, but sought injunctive relief only as to Counts III (breach of Bylaws) and IV (breach of fiduciary duty).[44]  On June 12, Saba amended its complaint to include allegations related to the BTZ definitive proxy statement, which was filed with the SEC the day after Saba's initial complaint.[45]  With respect to its claim for injunctive relief, Saba asked the court to order Appellants:

> to (1) refrain from precluding, invalidating, or interfering with [Saba's] presentation of its four trustee nominees for election to the Board of BTZ and BQH at the 2019 annual meetings of shareholders, and (2) to allow any proxies or votes cast in favor of [Saba's] nominees at the meeting to be counted so that this Court may subsequently determine the outcome of the election and the proper constitution of the Board.[46]

---

[44] The causes of action are the same in the original and the operative amended complaint.  They are: (1) breach of declaration of trust of BTZ; (2) breach of fiduciary duty to BTZ's shareholders; (3) breach of bylaws of BTZ and BQH; and (4) breach of fiduciary duty to shareholders of BTZ and BQH.  The first two causes of action relate to Saba's contention that Appellants, for improper purposes, unilaterally amended BTZ's Bylaws to change the voting and election requirements contrary to the language of its Declaration of Trust.  Saba specifically challenges the amended voting standard for contested director elections, which now requires a majority of the outstanding shares in order for a candidate to prevail.  Because our ruling renders Saba's candidates ineligible, the election is uncontested and the challenged amendment is not applicable.  We note that during oral argument before this Court, Saba expressed its interest in pursuing these claims, stating that it would "still like a ruling" because the issue likely would arise in the future.  *See* Oral Argument Video at 34:13–35:31.  However, we question why such a ruling would not be purely advisory following our decision here.  *See Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 480 (Del. 1989) ("The law is well settled that our courts will not lend themselves 'to decide cases which have become moot, or to render advisory opinions.'" (citation omitted)).

[45] *Opinion*, 2019 WL 2711281, at \*3.

[46] App. to Opening Br. at A68–A69 (Mot. for Prelim. Inj.).  Saba also requested in its Amended Complaint "an Order delaying the annual meetings of the Trusts, if necessary. . . ." *Id.* at A156.

Saba raised several different theories in its brief in support of its motion for preliminary injunction. It argued that it had submitted a timely Nomination Notice, and that the Questionnaire was not a part of the requirements of a Nomination Notice.[47] Saba also noted that it never received notice of any deficiency in the Nomination Notice. It then argued that there is no provision in the Bylaws that gives the Boards broad authority to make general information requests without warning, nor is there a provision that allows for requests for duplicative information. Saba further argued that its Trigger Theory was the correct reading of Section 7(e), and, therefore, the Trusts' information request was not a supplemental information request under Section 7(e)(ii). Finally, Saba argued that even if the Trusts could request supplemental information under Section 7(e)(ii), the five-business-day deadline did not apply to the Questionnaire because the Trusts did not identify a need for an update and supplement, and the Questionnaire went beyond the allowable scope because it "was not properly limited to the 'director qualifications' requirements of Article II, Section 1."[48]

The Court of Chancery heard argument on June 25, 2019 in response to Saba's request that the court "rule by June 28 in order to minimize the chance that brokers would

---

However, in argument before the Court of Chancery, Saba acknowledged that it was not asking for the meeting to be postponed. *Id.* at A1110 (Argument Tr.).

[47] *Id.* at A96 (Prelim. Inj. Opening Br.).

[48] *Id.* at A105.

discretionarily vote the shares of clients who did not provide voting instructions under New York Stock Exchange rules."[49]

On June 27, 2019, the court, on a "highly expedited and pre-discovery record,"[50] issued a Memorandum Opinion (the "Opinion") granting mandatory injunctive relief based on Saba's breach of Bylaws claim.[51] In reaching this conclusion, the Court of Chancery agreed with the Trusts that Section 7(e)(ii) was unambiguous. The court first described Saba's main theories as follows:

> Although Saba's position appeared to evolve somewhat from briefing to argument, it broadly asserts that a request under Section 7(e)(ii) may only be made subsequent to one or more of the following: an identified change to the contents of a Nomination Notice that requires an update or supplement, an update pursuant to Section 7(e)(i), or an information request under Section 7(d)(i)(C)(6).[52]

The court dismissed Saba's reading of the Bylaws, rejecting Saba's Trigger Theory and holding that of the Bylaws provisions addressed by the parties, Section 7(e)(ii) is the exclusive method in the Bylaws for the Boards to request supplemental information relating to Nomination Notice.[53] The court thus determined that "the Boards could request

---

[49] *Opinion*, 2019 WL 2711281, at *3.

[50] *Id.* at *1.

[51] *Id.* at *3–4.

[52] *Id.* at *4. Article I, Section 7(d)(i)(C)(6) of the Bylaws requires a Nomination Notice to include "information to establish to the satisfaction of the Board of Directors that the Proposed Nominee satisfies the director qualifications as set out in Section 1 of Article II." App. to Opening Br. at A407 (BQH Bylaws Art. I, § 7(d)(i)(C)(6)), A433 (BTZ Bylaws Art. I, § 7(d)(i)(C)(6)).

[53] *Opinion*, 2019 WL 2711281, at *5 ("Section 7(e)(ii) provides the sole method identified by the parties for the Boards to request supplemental information to a Nomination Notice.").

supplemental information related to the Nomination [Notice] on April 22 under Section 7(e)(ii)."[54]

However, the court said that the Trusts "went too far" with the Questionnaire. It explained that Section 7(e)(ii) establishes three limitations on what information the Trusts could request: "the desired information must be (a) for the purpose of determining whether Saba's nominees met Section 1's enumerated requirements, (b) 'reasonably requested' with that scope in mind, and (c) 'necessary' for the Boards' determinations."[55] The court found "that the Questionnaire as a whole was not 'reasonably requested' or 'necessary' to determine whether Saba's nominees met Section 1's requirements,"[56] and held that:

> [b]y including in the Questionnaire a substantial number of questions unrelated to Section 1's director qualifications, and nonetheless enforcing the strict five-day deadline to invalidate Saba's nominations, Defendants overstepped their authority under Section 7(e)(ii) while demanding strict compliance from Saba.[57]

The court also held that, because it was ruling for Saba on Count III, it need not reach any of the claims in Count IV alleging that the Trusts had acted inequitably. Nevertheless, the court stated that it would deny Saba relief "at this stage,"[58] as Saba had not met its burden under the mandatory injunction standard. It concluded that Section 7 of the Bylaws had been adopted on a "clear day" before this proxy contest, and that there was

---

[54] *Id.*

[55] *Id.*

[56] *Id.* at *6.

[57] *Id.*

[58] *Id.* at *7.

no evidence that they were being applied in bad faith. The court found that Saba's lack of proof was, in part, "a mess of Saba's own making" as it could have brought the claim weeks before it did, and "[t]he emergency nature of [Saba's motion] is, to some degree, a self-inflicted wound."[59] By waiting until June to file its case, Saba eliminated its opportunity to seek meaningful discovery prior to the hearing. However, the court stated that it would "stop short of finding that Saba is guilty of laches at this stage due to its reasonable belief that BTZ's annual meeting would not be scheduled until late July."[60]

On July 2, 2019, the Court of Chancery entered a partial final judgment pursuant to Court of Chancery Rule 54(b) as to the breach of Bylaws claim (Count III), deeming that Saba's nominees have been validly nominated, enjoining the Trusts from deeming Saba's nominees to be ineligible for failure to comply with Section 7(e)(ii), and requiring that the votes for those nominees to be counted.[61] Defendants filed a timely notice of appeal on July 10, 2019.

## II. STANDARD OF REVIEW

This Court reviews a grant of injunctive relief for an abuse of discretion.[62] Embedded legal conclusions, however, are reviewed *de novo*.[63] "The construction or interpretation of a corporate certificate or by-law is a question of law subject to *de novo*

---

[59] *Id.* (internal quotation marks omitted).

[60] *Id.*

[61] *See* Opening Br. at Ex. B (Partial Final Judgment).

[62] *Hill Int'l, Inc. v. Opportunity P'rs L.P.*, 119 A.3d 30, 37 (Del. 2015).

[63] *Id.*; *see North River Ins. Co. v. Mine Safety Appliances Co.*, 105 A.3d 369, 380–81 (Del. 2014).

review by this Court."[64] The trial court's findings of fact and inferences drawn from those facts are given deference unless clearly erroneous.[65] As this Court stated recently, this Court has a "long established policy against piecemeal appeals."[66] We reiterate that policy here, but we also continue to recognize the importance of providing timely appellate review of issues arising in the electoral setting, such as those presented here where the Court of Chancery has ordered mandatory injunctive relief enforcing its interpretation of an advance notice bylaw.[67]

## III.    ANALYSIS

Appellants raise two issues on appeal. First, they claim that the Court of Chancery erred by issuing a mandatory injunction requiring the Trusts to count votes for Saba's nominees, contrary to the plain and unambiguous language of the Bylaws. Second, they

---

[64] *Centaur P'rs, IV v. Nat'l Intergroup, Inc.*, 582 A.2d 923, 926 (Del. 1990).

[65] *DV Realty Advisors LLC v. Policemen's Annuity and Ben. Fund of Chicago*, 75 A.3d 101, 108 (Del. 2013); *Honeywell Int'l Inc. v. Air Prods. & Chems., Inc.*, 872 A.2d 944, 950 (Del. 2005).

[66] *Hill Int'l Inc.*, 119 A.3d at 36. *See Tyson Foods, Inc. v. Aetos Corp.*, 809 A.2d 575, 580 (Del. 2002) ("The policy underlying the final judgment rule is one of efficient use of judicial resources through disposition of cases as a whole, rather than piecemeal." (citing *Showell Poultry, Inc. v. Delmarva Poultry Corp.*, 146 A.2d 794, 795 (Del. 1958))); *Simmons v. Simmons*, 1992 WL 397461, at *1 (Del. Nov. 12, 1992) (ORDER) (noting the "strong policy of this Court not to accept piecemeal appeals from a single proceeding in a trial court"); *see also Zimmerman v. Home Shopping Network, Inc.,* 1990 WL 140890, at *1 (Del. Ch. Sept. 25, 1990) ("Rule 54(b) is not to be used as a vehicle to trigger routine appellate review in cases where summary judgment is granted as to some, but not all, of a party's claims. Rather, Rule 54(b) is an exception to the well-established policy against 'piecemeal' appeals, and does not contemplate the entry of final judgment absent a showing of some degree of hardship or injustice through delay which would be alleviated by immediate appeal." (internal citations and quotations omitted)).

[67] *See Hill Int'l Inc.*, 119 A.3d at 36; *see also Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651, 659 (Del. Ch. 1988) (observing that "[t]he shareholder franchise is the ideological underpinning upon which the legitimacy of directorial power rests," and that "it can be seen that matters involving the integrity of the shareholder voting process involve consideration not present in any other context in which directors exercise delegated power").

claim that the court erred in holding that the doctrine of laches did not bar Saba's request for equitable relief. We agree with Appellants on the former, but reject the latter.

### A. The Court Correctly Interpreted the Bylaws, But Erred in Granting Injunctive Relief In Light Of Saba's Failure to Timely Respond.

First, we address Appellants' argument that the Court of Chancery erred in granting mandatory injunctive relief to Saba. The court held that Appellants could not require Saba to comply with the five business day deadline because the Questionnaire exceeded the Bylaws' scope. Appellants contend that this ruling is contrary to the language of the clear and unambiguous Bylaws, which required Saba to respond to the information request within the deadline set forth in Section 7(e)(ii).

"To obtain a preliminary injunction, [Saba] must demonstrate: (1) a reasonable probability of success on the merits; (2) that [it] will suffer irreparable injury without an injunction; and (3) that [its] harm without an injunction outweighs the harm to the defendants that will result from the injunction."[68] The Court of Chancery viewed Saba's request as one seeking mandatory injunctive relief because requiring Appellants "to permit and count votes they otherwise would not have" would "upend, not preserve, [the] status quo."[69] There is a "higher mandatory injunction standard where, instead of seeking to preserve the status quo as interim relief, Petitioners, as a practical matter, seek the very

---

[68] *C & J Energy Servs., Inc. v. City of Miami Gen. Empls.' Ret. Tr.*, 107 A.3d 1049, 1066 (Del. 2014).

[69] *Opinion*, 2019 WL 2711281, at *4.

relief that they would hope to receive in a final decision on the merits."[70]  To obtain

mandatory injunctive relief, the movant must make a showing sufficient to support a grant

of summary judgment, that is, "[m]andatory injunctions should only issue with the

confidence of findings made after a trial or on undisputed facts."[71]  We agree with the Court

of Chancery that Section 7(e)(ii) is clear and unambiguous.  But based upon the record

before us, and as explained below, we hold that Saba was required to comply with the five-

business-day deadline.

     *1. The Bylaws are Clear and Unambiguous.*

The Bylaws "constitute part of a binding broader contract among the directors,

officers and stockholders formed within the statutory framework of the Delaware General

Corporation Law."[72]  "Because corporate charters and bylaws are contracts, our rules of

contract interpretation apply."[73]  "Words and phrases used in a bylaw are to be given their

commonly accepted meaning unless the context clearly requires a different one or unless

legal phrases having a special meaning are used."[74]  "Under the applicable interpretation

rules, if the bylaw's language is unambiguous, the court need not interpret it or search for

---

[70] *Alpha Builders, Inc. v. Sullivan*, 2004 WL 2694917, at *3 (Del. Ch. Nov. 5, 2004) (internal quotation marks omitted).

[71] *C & J Energy*, 107 A.3d at 1053–54; *see TW Servs., Inc. v. SWT Acq. Corp.*, 1989 WL 20290, at *6 (Del. Ch. Mar. 2, 1989) (finding that mandatory relief is not appropriate absent satisfying the standards applicable to summary judgment).

[72] *Hill Int'l Inc.*, 119 A.3d at 38; *see also Airgas Inc. v. Air Products & Chemicals, Inc.*, 8 A.3d 1182, 1188 (Del. 2010); *Centaur P'rs IV*, 582 A.2d at 928; *Lawson v. Household Fin. Corp.*, 152 A. 723, 726 (Del. 1930).

[73] *Hill Int'l Inc.*, 119 A.3d at 38*; Centaur P'rs IV*, 582 A.2d at 928.

[74] *Hill Int'l Inc.*, 119 A.3d at 38.  (quoting *Airgas, Inc.*, 8 A.3d at 1188) (internal quotation marks omitted).

the parties' intent."[75]  "If charter or bylaw provisions are unclear, we resolve any doubt in favor of the stockholder's electoral rights."[76]

In the proceedings below, Appellants and Saba both argued that the relevant Bylaws unambiguously support their interpretation.  Saba claimed that, under its Trigger Theory, Section 7(e)(ii) could be invoked only after one or more of the following occur: "an identified change to the contents of a Nomination Notice that requires an update or supplement, an update pursuant to Section 7(e)(i), or an information request under Section 7(d)(i)(C)(6)."[77]  Appellants, on the other hand, asserted "that Section 7(e)(ii) is the exclusive method for the Boards to request supplemental information relating to Nomination Notices in the Bylaws, and that such a request need not be preceded by any of the triggering events Saba identifies."[78]

The Court of Chancery held that the pertinent language of the Bylaws was unambiguous and agreed with Appellants' reading.  It held that Section 7(e)(ii) is "the sole method identified by the parties for the Boards to request supplemental information to a Nomination Notice."[79]  It reasoned that Section 7(d) addresses only what is required in a Nomination Notice.  Section 7(d)(i)(C)(6) reads:

> To be in proper written form, a record shareholder's notice to the Secretary must set forth the following information: (i) as to each person whom the

---

[75] *Id*. (quoting *Openwave Sys. Inc. v. Harbinger Capital P'rs Master Fund I, Ltd*., 924 A.2d 228, 239 (Del. Ch. 2007) (internal quotation marks omitted).

[76] *Id*.

[77] *Opinion*, 2019 WL 2711281, at *4.

[78] *Id.*

[79] *Id.* at *5.

23

shareholder of record proposes to nominate for election as a director (a "Proposed Nominee") and any Proposed Nominee Associated Person . . . (C) . . . (6) information to establish to the satisfaction of the Board of Directors that the Proposed Nominee satisfies the director qualifications as set out in Section 1 of Article II . . . .[80]

Thus, the court concluded that Section 7(d)(i)(C)(6) "does not include an independent right under that section for the Board to request information."[81] We agree that Section 7(d)(i)(C)(6) does not address follow-up requests to a Nomination Notice.

The Court of Chancery also properly rejected Saba's Trigger Theory. The court held that "a request under Section 7(e)(ii) does not need to follow the record date or any other triggering event related to Section 7(e)(i)."[82] It further noted that the conjunction "and" between the two subsections, which Saba references in support of its reading, "indicates only that the two subsections are not mutually exclusive, not that they must occur jointly."[83] We agree that a plain reading indicates that the occurrence of the events referred to in Section 7(e)(i) is not a prerequisite to the ability to make a request under Section 7(e)(ii). Thus, "the Boards could request supplemental information related to the [Nomination Notice] on April 22 under Section 7(e)(ii)."[84] Because Section 7(e)(ii)

---

[80] App. to Opening Br. at A407 (BQH Bylaws Art. I, § 7(d)(i)(C)(6), A433 (BTZ Bylaws Art. I, § 7(d)(i)(C)(6)).

[81] *Opinion*, 2019 WL 2711281, at *5.

[82] *Id.*

[83] *Id.* at n.35. The Court of Chancery observed that, "[a]ny other reading would lead to bizarre results. For instance, the Board would have no right to request supplemental information (under Section 7(e)(ii)) in situations where a shareholder did not, or was not required to, update its Nomination Notice to reflect changes as of the record date (under Section 7(e)(i))." *Id.*

[84] *Id.* at *5.

contains a response deadline, supplemental information requested pursuant to that section must be submitted to the Trusts within five business days of the request.

### 2. *Saba Missed the Section 7(e)(ii) Deadline.*

We part company with the Court of Chancery as to the remainder of its analysis of Section 7. We conclude that under the clear language of the Bylaws, Saba had an obligation to respond to the request before the expiration of the deadline. Instead, Saba did nothing and let the deadline pass.

As the Trusts concede, there are questions in the Questionnaire not tethered to Section 1. These include, as the Court of Chancery noted, questions about the Iran Threat Reduction and Syria Human Rights Act of 2012, academic probation, sexual misconduct, future business commitments, and nominations to other boards.[85] But the Questionnaire is comprised of other questions that are directly tied to the nominee qualifications under Section 1. It is undisputed that at least one-third of the questions in the Questionnaire are directly relevant to Section 1. And it is undisputed that Saba failed to respond in any way prior to the deadline. If, after reviewing the Questionnaire, Saba believed that the Questionnaire exceeded the limits of Section 7(e)(ii), it should have raised that concern

---

[85] *Id.* at *5–6. The Trusts' counsel noted in argument before the Court of Chancery:

> And when you go through the questionnaire - - you know, there's no secret that this is a regulated entity. The consequences of this fund having a majority of interested directors is draconian. If we blow it, it's no longer a registered investment company. Its contracts could be voidable. The SEC could commence enforcement proceedings. There's a whole slew of bad consequences that could relate to the BlackRock funds if it turns out that there are people on the board who are interested.

App. to Opening Br. at A1173.

with the Trusts before the expiration of the deadline. What it could not do, without risking disqualification of its nominees, was to stay silent, do nothing, and let the deadline pass. Its failure to raise any objection undercuts its various challenges to the Questionnaire, namely, that the requests were premature, duplicative, unreasonable, or the product of entrenchment motives, or that no response was required.

Although the Court of Chancery's decision hinged upon the Questionnaire's "over-breadth," the record does not suggest that the Questionnaire's over-breadth precluded a timely response.[86] Saba mentioned this excuse only when it stated that, "to the extent that the Board requested information not contained in Saba's Notice—that is, information unrelated to the issue of whether the nominees meet the director qualifications as set forth in the Bylaws—those requests in particular are unreasonable."[87] This was the only contention that resembled an over-breadth argument in Saba's May 1, 2019 letters, which were each three pages long. Similarly, in its six-page May 7, 2019 letter, Saba re-argued its Trigger Theory and raised over-breadth only by reiterating the same phrase.[88] As the events leading up to this action were unfolding, the gravamen of Saba's argument was that either the Questionnaire was not necessary because the questions were duplicative of what

---

[86] This seems apparent, in part, in view of Saba's inclusion of response to the Questionnaires for each of its nominees in its May 1 letters, even though the Trusts viewed these responses as deficient in certain respects.

[87] App. to Opening Br. at A622, A625 (Schulte Roth May 1, 2019 Letters)

[88] *See id.* at A828 (Saba May 7, 2019 Letter) ("And, because the Notice already provided information sufficient to establish that each nominee of Saba is qualified to serve as a director under the Bylaws and the 1940 Act, *to the extent that the Board requested information not contained in Saba's Notice—that is, information unrelated to the issue of whether the nominees meet the director qualifications as set forth in the Bylaws—those requests in particular are unreasonable.*" (emphasis added)).

was already given in the Nomination Notice, or its "Trigger Theory"—that the five business day deadline was premature because a request under Section 7(e)(ii) can be brought only after the record date and an update and supplement pursuant to Section 7(e)(i).

A reasonable reading of the record is that Saba misread the Bylaws and did not think it had to respond to the follow-up request within five business days, and that the other justifications were after-the-fact excuses. In fact, it told the Court of Chancery that it "did not view the Questionnaire as falling under the five business day deadline imposed by Section 7(e)(ii)."[89] We recognize that the April 22, 2019 transmittal email made no mention of a five-business-day deadline, nor did it specify that the request was being sent pursuant to Section 7(e)(ii). But, as the Court of Chancery noted:

> Saba, a sophisticated entity that had already completed the Nomination [Notice] and understood the structure of the Bylaws, could only have been reasonably confused by the April 22 email if there was another method under Section 7 for the Boards to request additional information about the nominations. As addressed above, Section 7(e)(ii) is the only provision applicable to that purpose.[90]

Because Section 7(e)(ii) speaks clearly to the Board's ability to request supplemental information with regard to the Nomination Notice, Saba, as a sophisticated corporate entity, should have understood that, and its failure to respond does not justify disregarding the deadline.

---

[89] *Opinion*, 2019 WL 2711281, at *3 (stating that, "[a]t argument, Saba's counsel represented that Saba and the nominees began completing the Questionnaire on or about April 22, but that Saba did not view the Questionnaire as falling under the five business day deadline imposed by Section 7(e)(ii).").

[90] *Id.* at *5.

In a perfect world, the Trusts' request for supplemental information would have identified the portions within the bounds of Section 1 and would have referenced Section 7(e)(ii) and noted the deadline. But even though these things were not done, we are reluctant to hold that it is acceptable to simply let pass a clear and unambiguous deadline contained in an advance-notice bylaw, particularly one that had been adopted on a "clear day."[91] Bylaws, including advance notice bylaws, are "commonplace"[92] and are interpreted using contractual principles. If such provisions are unclear, we resolve any doubt in favor of stockholders' electoral rights.[93] But the provisions at issue here were clear, as the Court of Chancery held. A rule that would permit election-contest participants to ignore a clear deadline and then, without having raised any objection, proffer after-the-fact reasons for their non-compliance with it, would create uncertainty in the electoral setting. Encouraging such after-the-fact factual inquiries into missed deadlines could potentially frustrate the purpose of advance notice bylaws, which "are designed and function to permit orderly meetings and election contests and to provide fair warning to the corporation so that it may have sufficient time to respond to shareholder nominations."[94]

---

[91] *See, e.g., AB Value Partners, LP v. Kreisler Mfg. Corp.*, 2014 WL 7150465, at *3 (Del. Ch. Dec. 16, 2014) (holding that the plaintiff did not state a colorable claim that an advance notice bylaw (adopted on a clear day) was improperly enforced when the plaintiff missed a deadline).

[92] *Goggin v. Vermillion, Inc.*, 2011 WL 2347704, at *4 (Del. Ch. June 3, 2011) (quoting *Openwave Sys.*, 924 A.2d 228, 238–39); *Mentor Graphics Corp. v. Quickturn Design Sys. Inc.*, 728 A.2d 25, 43 (Del. Ch. 1998), *aff'd on other grounds sub nom. Quickturn Design Sys., Inc. v. Shapiro*, 721 A.2d 1281 (Del. 1998).

[93] *See Hill*, 119 A.3d at 38 ("If charter or bylaw provisions are unclear, we resolve any doubt in favor of the stockholder's electoral rights.").

[94] *Openwave Sys.*, 924 A.2d at 239; *see Boilermakers Local 154 Retirement Fund v. Chevron Corp.*, 73 A.3d 934, 952 (Del. Ch. 2013); 1 R. FRANKLIN BALOTTI & JESSE A. FINKELSTEIN, DELAWARE LAW OF CORPORATIONS AND BUSINESS ORGANIZATIONS, § 7.9 (3d ed. 2020) ("In order

Accordingly, we hold that Saba was obligated to respond prior to the expiration of the five-business-day deadline set forth in Section 7(e)(ii).

Further, we observe that in the limited record before us, there is no evidence of any manipulative conduct on the part of the Trusts. Delaware law protects stockholders in instances where there is manipulative conduct or where the electoral machinery is applied inequitably.[95] The Court of Chancery correctly observed that such an allegation "requires more than merely laying out the timeline of Defendants' conduct and speculating about bad intent or purpose."[96] As noted above, Saba could have brought its claims weeks before

---

to permit an orderly period of solicitation prior to a meeting, many corporations have adopted provisions in their certificates of incorporation or bylaws to provide for advance notice of the nomination of directors or of matters to be raised at a meeting."); ARTHUR FLEISCHER, JR., ALEXANDER R. SUSSMAN & GAIL WEINSTEIN, TAKEOVER DEFENSE: MERGERS AND ACQUISITIONS, § 6.06 (8th ed. 2018) ("Advance notice bylaw provisions provide several benefits to a company, including giving a board time to evaluate the proposed candidates and preventing last-minute "surprise attacks" by third parties for control or board representation.").

[95] *See, e.g., MM Cos. v. Liquid Audio, Inc.*, 813 A.2d 1118, 1132 (Del. 2003) (invalidating the expansion of directors from five to seven because the primary purpose of that expansion was to impede the stockholders' right to vote effectively in an impending election for successor directors); *Schnell, Inc. v. Chris-Craft Indus., Inc.*, 285 A.2d 437, 439 (Del. 1971) ("[I]nequitable action does not become permissible simply because it is legally possible."); *Blasius Indus., Inc.*, 564 A.2d at 652 (holding that a board act done with care and in good faith but "for the primary purpose of preventing or impeding an unaffiliated majority of shareholders from expanding the board and electing a new majority" is invalid); *Aprahamian v. HBO & Co.*, 531 A.2d 1204, 1208 (Del. Ch. 1987) (enjoining the incumbent board from further delaying the company's annual stockholders meeting given the timing, "on the eve of the meeting, upon learning that they might be turned out of office"); *Mesa Petroleum Co. v. Unocal Corp.,* 1985 WL 44692, at *5–6 (Del. Ch. Apr. 22, 1985) (finding inequitable a 30-day notice bylaw interpreted by a corporation effectively to require 90-days' notice under the circumstances in question, a requirement with which the dissident stockholder could not possibly comply); *Lerman v. Diagnostic Data, Inc.* 421 A.2d 906, 914 (Del. Ch. 1980) (holding that a 70-days' notice bylaw was inequitable in a situation where the board announced the annual meeting only 63 days before it was to occur, rendering compliance impossible).

[96] *Opinion*, 2019 WL 2711281, at *7.

when it actually, did, and thus the emergency nature of Saba's motion and having to proceed without discovery is, "to some degree, a self-inflicted wound."[97]

In sum, although we agree with the Court of Chancery's interpretation of the Bylaws, we disagree with the court's decision to excuse Saba's non-compliance with the deadline based upon the record before us. Accordingly, we hold that Saba's nominations are deemed ineligible under Section 7 due to their failure to timely respond to the Trusts' request for supplemental information.

### B. Saba's Claims Were Not Barred by Laches.

To the extent that it becomes relevant on remand, we address the Appellants' second issue, and we affirm the Court of Chancery's determination that Saba was not guilty of laches. To raise the equitable defense of laches, the party raising the defense bears the burden of showing "first, knowledge by the claimant; second, unreasonable delay in bringing the claim; and third, resulting prejudice to the defendant."[98] "A trial court's application of equitable defenses presents a mixed question of law and fact."[99]

Appellants argue that Saba unreasonably waited until June 4 to file this action, thirty-five days after they informed Saba that its director nominations were invalid. They further assert that they were prejudiced by this delay because voters may have voted or

---

[97] *Id.* (internal quotation marks omitted).

[98] *Whittington v. Dragon Grp., L.L.C.*, 991 A.2d 1, 8 (Del. 2009) (quoting *Reid v. Spazio*, 970 A.2d 176, 182–83 (Del. 2009) (internal quotation marks omitted).

[99] *Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1043 (Del. 2014).

failed to vote based on the understanding that Saba's nominees would not be counted as stated in the Trusts' proxy materials.

However, the relevant facts are not in dispute and the Appellants fail to adequately explain why we should not defer to the court's findings. We agree with the Court of Chancery that, based on the prior year's July 30 meeting date, Saba had reason to believe BTZ's 2019 annual meeting date would be in late July.

Moreover, Appellants argued in the proceedings below that Saba's delay in filing the action would be harmful because of the costs associated with corrective disclosures and soliciting additional votes in a compressed time period.[100] But, as the Court of Chancery noted, Appellants "set the BTZ meeting date after Saba filed its initial complaint, so costs related to its rapid approach are at least partly self-imposed."[101] BTZ's 2019 annual meeting date was set to take place on July 8, 2019, approximately three weeks earlier than the prior-year annual meeting. The meeting was also ten days earlier than BQH's July 18, 2019 annual meeting, even though BQH's proxy materials were filed earlier than BTZ's. The Appellants admit it could have set BTZ's meeting date as far out as August 24.[102] Thus, we concur with the court that the prejudice the Appellants allege is not entirely a

---

[100] App. to Opening Br. at A251 (Prelim. Inj. Opp'n Br.).

[101] *Opinion*, 2019 WL 2711281, at *8.

[102] Opening Br. at 34 ("BTZ's prior annual meeting was held on July 30, 2018, and therefore BTZ's 2019 meeting could have been held on any date between July 5 and August 24, 2019, without eliminating the application of BTZ's advance notice deadline.").

result of Saba's delay in filing the suit. Accordingly, we find no error in the Court of Chancery's rejection of the Appellants' laches contentions.[103]

## IV.   CONCLUSION

Based on the foregoing, we affirm the Court of Chancery's interpretation of the Bylaws. However, we reverse the court's grant of Saba's request for mandatory injunctive relief. We affirm the court's holding that Saba's equitable claims are not barred by laches.

Thus, we **AFFIRM** in part, and **REVERSE** in part, and **REMAND** to the Court of Chancery for further proceedings.

---

[103] During oral argument, we expressed our concern that by delaying filing suit and foreclosing itself from taking discovery prior to pressing for relief, Saba might seek to press issues that it could have raised earlier and then seek further appellate review in this Court. We note, in this regard, certain issues raised in footnotes in Saba's Answering Brief but which were not seriously pressed on appeal. *See* Answering Br. at 33 n.16 (arguing that only the Chairperson of the meeting— during the meeting—can make an ineligibility determination, and that Saba's failure to comply was immaterial as it constituted only a short delay). Although we affirm the Vice Chancellor's ruling on laches, our ruling should not be viewed as an invitation to engage in further litigation on issues that are fairly subsumed within our ruling today or that could have been the subject of a cross-appeal.